MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2018 ME 127
Docket:        BCD-18-228
Argued:        July 18, 2018
Decided:       August 23, 2018

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:      SAUFLEY, C.J., and MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Concurrence:   SAUFLEY, C.J., and MEAD, J.
Dissent:       ALEXANDER, J.

MAINE EQUAL JUSTICE PARTNERS et al.

v.

COMMISSIONER, DEPARTMENT OF HEALTH AND HUMAN SERVICES

JABAR, J.

[¶1]  Before us is the Department of Health and Human Services' motion asking us to stay the effect of a partial judgment entered in the Business and Consumer Docket (*Murphy, J.*) dated June 4, 2018, and to issue an expedited briefing schedule governing the Department's appeal from that partial judgment.   There are substantial unresolved issues surrounding the petitioners' appeal filed pursuant to M.R. Civ. P. 80C, and it is clear from the limited record before us that those issues must be resolved before we can consider the matter on the merits.  Because an appeal of the Superior Court order mandating the implementation of only one provision of the citizen initiative expanding Medicaid coverage is interlocutory and because, on these

unique facts, no exception to the final judgment rule exists, we deny the motion for an expedited briefing schedule and dismiss the Department's appeal.

## I. BACKGROUND

[¶2]  On November 7, 2017, the voters of Maine approved a citizen initiative entitled "An Act to Enhance Access to Affordable Health Care" (the Act).  *See* L.D. 1039, ch. 1, §§ A-1 to B-3 (referred to the voters, 128th Legis. 2017) (effective Jan. 3, 2018) (to be codified at 22 M.R.S. § 3174-G(1)(H)[1]).  The Act, which expands Medicaid coverage, was not acted upon by the Legislature but nonetheless became the law after enactment by the people.  *See* L.D. 1039, ch. 1, §§ A-1 to B-3; *see also* Me. Const. art. IV, pt. 3, § 19; *Opinion of the Justices*, 2017 ME 100, ¶¶ 43-44, 162 A.3d 188.  Title 22 M.R.S. § 3174-G(1) requires the Department to "provide for the delivery of federally approved Medicaid services to the following persons," now including, pursuant to the Act,

> H.  No later than 180 days after the effective date of this paragraph, a person under 65 years of age who is not otherwise eligible for assistance under this chapter and who qualifies for medical assistance pursuant to 42 United States Code, Section 1396a(a)(10)(A)(i)(VIII) when the person's income is at or below 133% plus 5% of the nonfarm income official poverty line for the

---

[1]  The Maine Revised Statutes are current only through changes made during the First Special Session of the 128th Legislature; because this bill was approved by voters on November 7, 2017, it does not yet appear in the Maine Revised Statutes.

applicable family size. The department shall provide such a person, at a minimum, the same scope of medical assistance as is provided to a person described in paragraph E.

. . . .

No later than 90 days after the effective date of this paragraph, the department shall submit a state plan amendment to the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ensuring MaineCare eligibility for people under 65 years of age who qualify for medical assistance pursuant to 42 United States Code, Section 1396a(a)(10)(A)(i)(VIII).

The department shall adopt rules, including emergency rules pursuant to Title 5, section 8054 if necessary, to implement this paragraph in a timely manner to ensure that the persons described in this paragraph are enrolled for and eligible to receive services no later than 180 days after the effective date of this paragraph. Rules adopted pursuant to this paragraph are routine technical rules as defined by Title 5, chapter 375, subchapter 2-A.

L.D. 1039, ch. 1, § A-3.

[¶3] April 3, 2018, marked the passage of ninety days without action by the Department, contrary to the Act's mandate to file a state plan amendment (SPA) within ninety days after the effective date.[2] On April 30, 2018, Maine Equal Justice Partners (MEJP) and others[3] filed a petition for review pursuant

---

[2] Although the parties dispute the precise effective date of the legislation, the Superior Court found that more than ninety days had passed since either date proposed by the parties.

[3] In addition to MEJP, petitioners consist of Consumers for Affordable Health Care, Maine Primary Care Association, Penobscot Community Health Care, and numerous individuals newly eligible for MaineCare pursuant to the Act's provisions.

to M.R. Civ. P. 80C and 5 M.R.S. § 11001(2) (2017) based on the Department's failure to initiate the implementation of the Act. As relief, petitioners requested that the Superior Court:

a. Declare that the Commissioner is under an existing statutory obligation pursuant to 22 M.R.S. § 3174-G(1)(H) to submit a state plan amendment to the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services ensuring MaineCare eligibility for people under 65 years of age who qualify for medical assistance pursuant to 42 United States Code, Section 1396a(a)(10)(A)(i)(VIII);

b. Order that DHHS, within 3 days, submit the required state plan amendment to CMS;

c. Declare that DHHS is under an existing statutory obligation pursuant to 22 M.R.S. § 3174-G(1)(H) to adopt rules, including emergency rules pursuant to Title 5, section 8054 if necessary, to implement § 3174-G(1)(H) in a timely manner to ensure that people under 65 years of age who qualify for medical assistance pursuant to 42 United States Code, Section 1396a(a)(10)(A)(i)(VIII) are enrolled for and eligible to receive services no later than July 2, 2018;

d. Order that DHHS adopt the required rules in a timely manner to ensure that eligible individuals are enrolled for and eligible to receive services no later than July 2, 2018; and

e. Grant Petitioners such other and further relief as it deems appropriate.

[¶4]  On June 4, 2018, the Superior Court entered a partial judgment in favor of the petitioners on the merits of a portion of the Rule 80C appeal. In its order, the court addressed the Commissioner's argument that "because

180 days have not passed since the effective date of [the Act], the question of whether or not the Commissioner is required to promulgate rules or provide coverage is not yet ripe" and concluded that "only the questions concerning the filing of the SPA are ripe, not those pertaining to rulemaking or coverage because the deadlines for those actions are still on the horizon."

[¶5]  The court's preliminary order regarding the filing of the SPA did not address all of the requests for relief that the petitioners sought or otherwise address the Department's obligation—or lack thereof—to implement the statute's directives regarding rulemaking or the full implementation of expansion, because it concluded that those particular issues were not ripe for its review.  The court therefore addressed only the relief requested pursuant to sections a and b of the petition quoted above and concluded, without factual findings, that the plain language of the statute required the Commissioner to submit the SPA by April 3, 2018.  It therefore ordered the Department to submit the SPA to the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, by June 11, 2018.

[¶6]  On June 7, 2018, the Department filed a notice of appeal and a motion to expedite the appeal with us.  In its motion, the Department also contended that the judgment on the Rule 80C petition was automatically stayed

pending the resolution of this appeal. MEJP opposed the Department's motion. On June 11, 2018, the same day that MEJP filed its opposition, we issued an order directing the Superior Court "to determine the immediate enforceability of [its] order pending appeal or for any stay or injunction pending appeal." On June 15, 2018, the Superior Court denied the Department's motion for a stay.

[¶7] On June 18, 2018, the Department again asked us to stay the execution of the judgment and expedite the appeal. On June 20, 2018, we issued an order setting a hearing on the Department's renewed motion and issued a temporary stay in order to preserve the status quo in the interim. On July 18, 2018, we heard argument on the procedural status of this appeal. We now address the partial judgment of the trial court based on our review of the limited record before us.

## II. DISCUSSION

[¶8] "A final judgment or final administrative action is a decision that fully decides and disposes of the entire matter pending before the court or administrative agency, leaving no questions for the future consideration and judgment of the court or administrative agency." *Brickley v. Horton*, 2008 ME 111, ¶ 9, 951 A.2d 801 (quotation marks omitted); *see also Bank of N.Y. v. Richardson*, 2011 ME 38, ¶ 7, 15 A.3d 756 ("A judgment is final only if it

disposes of all the pending claims in the action, leaving no questions for the future consideration of the court.") (quotation marks omitted)). Even where neither party has raised the issue of a judgment's finality, "we may dismiss [an] appeal sua sponte[4] if we determine that the appeal is unripe." *Brickley*, 2008 ME 111, ¶ 9, 951 A.2d 801. When there is further action to be taken in a given case, that case is interlocutory and not ripe for appellate review. *See Taylor v. Walker*, 2017 ME 218, ¶ 8, 173 A.3d 539. When a "decision from us at this stage would be entirely premature," dismissal of the interlocutory appeal is proper. *Brickley*, 2008 ME 111, ¶ 10, 951 A.2d 801.

[¶9] We conclude that this appeal is interlocutory "because a decision from us at this stage would be entirely premature." *Id.* The initiating petition in this case requested numerous forms of relief. *See infra* ¶ 3. No factual record was created, and the Superior Court addressed only one component of the requested relief because it concluded that certain key components and deadlines of the Act were "still on the horizon"—namely, the Act's mandate that the Department "[n]o later than 180 days after the effective date of this paragraph . . . shall provide" newly eligible persons "at a minimum, the same

---

4 Sua sponte means "[w]ithout prompting or suggestion; on its own motion." *Sua sponte*, Black's Law Dictionary (10th ed. 2014).

scope of medical assistance as is provided to a person described in paragraph E." *See infra* ¶ 2. On remand, the court will determine whether any ripeness issues remain.

[¶10] Although much of the analysis developed by the parties and the court has focused on the plain language of the Act, the implementation must be done in accordance with the Maine Constitution, article IV, part 3, section 19, which states that

> any measure referred to the people and approved by a majority of the votes given thereon shall, unless a later date is specified in said measure, take effect and become a law in 30 days after the Governor has made public proclamation of the result of the vote on said measure . . . ; *provided, however, that any such measure which entails expenditure in an amount in excess of available and unappropriated state funds shall remain inoperative until 45 days after the next convening of the Legislature in regular session.*

(Emphasis added.) Whether the Act has become operative, with or without any Legislative action, must be determined initially by the trial court.

[¶11] To be clear, we do not reach the merits of this appeal at this juncture because MEJP's petition has not been disposed of in its entirety. Before an appeal to us is proper, all factual and legal issues and requests for relief must be litigated, dismissed, or withdrawn. That has not happened here, and as a result, we must dismiss this appeal as interlocutory. Because we dismiss the appeal, our stay preserving the status quo is lifted, and the

Department's renewed motion for a stay and to expedite the appeal is denied. We direct the Superior Court to dispose of the remaining requests in the petition, as well as any issues that may have arisen now that the 180-day deadline has passed, in as timely a manner as possible, and we clarify that, in the interim, the June 4, 2018, and June 15, 2018, orders of the Superior Court remain in effect.

The entry is:

Appeal dismissed.

---

SAUFLEY, C.J., with whom MEAD, J., joins, concurring.

[¶12]  We concur in the opinion of the Court dismissing the appeal as interlocutory.

[¶13]  We write separately to indicate that, although we agree with our colleague in dissent that attention must be paid to the Legislature's constitutional authority and responsibility for funding government programs, *see* Me. Const. art. V, pt. 3, § 4, and the specific language of the Constitution addressing implementation of the people's initiative, *see* Me. Const. art. IV, pt. 3, § 19, we conclude, as has the Court, that any legal determination related to those concerns is premature.  Because the order of the trial court is, in practical

10

terms, wholly preliminary, there is no basis for the Law Court to act in this piecemeal appeal from the action of the court.

[¶14]  Given the current state of the record, the trial court's mandate regarding the submission of a plan will likely have no practical effect.[5]

[¶15]  To be clear, the Legislature could have, but did not, repeal the law enacted by the people's initiative. *Cf. Opinion of the Justices*, 2017 ME 100, ¶ 52, 162 A.3d 188.  Accordingly, the law exists, and there are now two identified routes to resolving the conflict that is pending before the Superior Court.  Either (1) the Legislative Branch can allocate a reasonable amount of appropriate funding for the expanded group of recipients, or, in the absence of such funding, (2) the Judicial Branch must analyze and effectuate the constitutional provisions that address the operation of the people's initiative and the judiciary's authority to effectuate the provisions of the Maine Constitution.  *See* Me. Const. art. III, § 2; Me. Const. art. IV, pt. 3, § 19; Me. Const. art. V, pt. 3, § 4.

[¶16]  Neither of those events has been accomplished to date, leaving the question of funding unresolved.  Yet, as the parties acknowledge, the federal

---

[5]  Although, in contrast to the dissent, we assume that the Executive Branch will comply with the trial court's order to submit "a plan," that submission cannot, in practical terms, meet the requirements of the federal law at this stage of the trial court's proceeding. *Cf.* 42 U.S.C.S. 1396a(a)(2) (LEXIS through Pub. L. No. 115-108).

Medicaid program requires that any Medicaid plan or state plan amendment must include information regarding the extent of state financing for the plan. *See* 42 U.S.C.S. 1396a(a)(2) (LEXIS through Pub. L. No. 115-108).

[¶17]  Accordingly, on the limited record before us, where the Legislature has not acted and the trial court has not even reached the constitutional analysis regarding the implementation of the initiative, it is likely that any plan submitted by the Executive Branch will, by definition, have to report candidly that no legislative action or judicial adjudication regarding funding has been completed.  Because such a plan appears to have no reasonable likelihood of meeting the approval of the administrators of the federal Medicaid program, there is little risk that "substantial rights of a party will be irreparably lost if review is delayed until final judgment."  *Bruesewitz v. Grant*, 2007 ME 13, ¶ 8, 912 A.2d 1255.  Therefore, it is neither appropriate nor necessary for the Law Court to consider this interlocutory appeal.

[¶18]  As the Court indicates, the matter should be returned to the trial court for an expedited and thorough analysis of the facts and law, with a careful review of the constitutional provisions that must guide the courts in this inter-branch proceeding, particularly Me. Const. art. IV, pt. 3, § 19.  Court's Opinion ¶¶ 10-11.

12

_____

ALEXANDER, J., dissenting.

[¶19] Today the Court orders that "the June 4, 2018, and June 15, 2018, orders of the Superior Court remain in effect" and that "our stay preserving the status quo is lifted." Court's Opinion ¶ 11. With the stay lifted, the Superior Court's mandate to submit the Medicaid expansion implementation plan to the federal Centers for Medicare and Medicaid Services is "in effect." *Id.*

[¶20] The deadline set for submission of the expansion plan has already passed. If the Commissioner of the Department of Health and Human Services is unable to prepare and submit that plan almost immediately after this Court's opinion issues, the plaintiffs will be able to seek action by the Superior Court to enforce its mandate. That enforcement action could result in appointment of a receiver, or other judicial action to usurp the executive authority of the Commissioner and perhaps the Governor, to draft and submit a plan.

[¶21] I respectfully dissent from the Court's actions lifting the stay and freeing the Superior Court to enforce its mandate that the Commissioner prepare and file a plan to implement the authorized but unfunded Medicaid expansion approved by citizen initiative. The stay we ordered should remain

in effect, and we should proceed expeditiously to address the merits of the Commissioner's appeal of the Superior Court's mandate.

## I.  REACHING THE MERITS OF THIS APPEAL

[¶22]  The Court holds that maintenance of the stay is not possible because the Superior Court's actions are interlocutory and many issues remain to be resolved before the Superior Court's action on the plaintiffs' complaint can be finalized.  Court's Opinion ¶ 11.  I concur that there is much to be resolved—most fundamentally, the limits of judicial authority under the strict separation of powers clause, in article III of our Maine Constitution, to order submission of a plan to implement a program, without an approved appropriation, that all agree will cost tens of millions of dollars to implement.

[¶23]  In ordering that an implementation plan be submitted to the federal government, the Superior Court bypassed those nettlesome questions and issued a mandate that can subject state officials to a contempt sanction, *see* M.R. Civ. P. 66, and/or appointment of a receiver if no plan is submitted.  Beyond the risk of contempt or displacement of executive authority by a court appointed receiver, mandated filing of an implementation plan may also have significant cost implications for the State.

14

[¶24]  The plaintiffs in this matter are represented by skilled counsel. Pending our reaching the merits, we should assume that the plaintiffs have some chance of success on their claim that the courts can mandate filing of the Medicaid expansion plan.  Once the plan is filed, the plaintiffs contend, the courts can and will mandate payments to those who qualify for benefits, even without any additional appropriation.

[¶25]  Specifically, the plaintiffs contend that once the implementation plan is submitted, qualified individuals, some of whom are already applying for benefits, may, by court order, begin receiving the expanded Medicaid payments. The plaintiffs assert that these additional costs will be paid from funds already appropriated to support those presently receiving Medicaid benefits.  *See* Appellees' Opposition to Motion to Stay Pending Appeal, at 13:

> [T]here are existing appropriations in the Medicaid accounts sufficient to fund Maine's Medicaid program and provide benefits for all eligible populations described in . . . 22 M.R.S. § 3174-G(1)— including the expansion population newly added as Paragraph (H) to that subsection—through at least May of 2019. . . . Accordingly, even with no additional legislative appropriation, the Department is statutorily obligated to implement newly-enacted Paragraph (H), just as it is statutorily obligated to implement Paragraphs (A), (B), (C), (D), (E), (F), and (G).

[¶26]  Alternatively, the plaintiffs have contended that courts might mandate expenditures of unused funds in other state accounts, such as the so

called "Rainy Day Fund" or other funds, already appropriated, that have not yet been spent. The prospect of the courts reviewing state program accounts, identifying unspent funds, and ordering those funds transferred to and spent on the Medicaid expansion demonstrates considerable misunderstanding of our constitutional separation of powers.

[¶27] Based on the plaintiffs' arguments about how expanded benefits can be paid once a plan is filed, the plan filing mandate is a final judgment requiring no further trial court action before individuals who qualify can become eligible for expanded benefit payments. Even if the trial court's mandate remains an interlocutory order, as the Court holds it is, an exception to the final judgment rule requires that we consider this appeal.

[¶28] Under the "death knell" exception to the final judgment rule, an interlocutory appeal is permitted when "substantial rights of a party will be irreparably lost if review is delayed until final judgment." *Bruesewitz v. Grant,* 2007 ME 13, ¶ 8, 912 A.2d 1255; *see also U.S. Dep't of Agric., Rural Housing Serv. v. Carter,* 2002 ME 103, ¶ 12, 799 A.2d 1232 (stating that the death knell exception is available when the injury to the appellant's claimed right, absent appeal, would be imminent, concrete, and irreparable).

[¶29]  We have held that the death knell exception to the final judgment rule authorizes appeals from a "mandatory" injunction—an injunction, as at issue in this case, that requires the enjoined party to affirmatively act and change, rather than maintain, the status quo.  *Dep't of Environmental Prot. v. Emerson*, 563 A.2d 762, 765-67 (Me. 1989).  Unless we are willing to overrule *Emerson*, we must address the merits of the Commissioner's appeal from the Superior Court's mandatory injunction.

## II.  MAINTAINING THE STAY

[¶30]  Pending our reaching the merits of the Commissioner's appeal, the conditions in June that led us to order a stay of the Superior Court's mandate have not changed.  If anything, the conditions today more strongly favor a stay because the plaintiffs have been quite honest in stating that they hope to fund the Medicaid benefits they seek by taking from funds already appropriated for current Medicaid beneficiaries and using those funds to pay benefits to the 70,000 newly eligible individuals.

[¶31]  Requests for stays or injunctions before the Law Court are subject to the same standards for obtaining injunctive relief that are applied in the trial courts.  *See Bangor Historic Track, Inc. v. Dep't of Agric., Food & Rural Resources*, 2003 ME 140, ¶¶ 9-12, 837 A.2d 129.  To obtain a stay, the moving party "must

demonstrate that (1) it will suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm which granting the injunctive relief would inflict on the other party; (3) it has a likelihood of success on the merits (at most, a probability; at least, a substantial possibility); and (4) the public interest will not be adversely affected by granting the injunction." *Id.* ¶ 9 (*citing Emerson,* 563 A.2d at 768); *accord Respect Me. PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) (noting that the "most critical" factors in considering a stay pending appeal are "(1) whether the applicant has made a strong showing that he is likely to succeed on the merits; [and] (2) whether the applicant will be irreparably injured absent relief. . . . Plaintiffs must show a strong likelihood of success, and they must demonstrate that irreparable injury will be likely absent an injunction." (*citing Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21-22 (2008))).

## A.    Irreparable Injury

[¶32]  Addressing irreparable injury first: The plaintiffs propose to fund the Medicaid expansion by taking funds already appropriated to support payments to those who qualified to receive Medicaid benefits before approval of the citizen initiative.  The plaintiffs recognize that their plan will exhaust the fiscal year 2019 appropriation sometime next spring, well before the end of the

fiscal year. By then, the plaintiffs argue, the Legislature and the Governor may authorize new resources to assure that benefits can be paid to all through the end of the fiscal year. In the meantime, current Medicaid beneficiaries and health care providers will be irreparably injured by longer wait times for treatment, delays in claims processing and payments, and reduced availability of out-patient and in-patient care occasioned by a large influx of new patients competing to use already too limited staff, facilities, and financial resources.

[¶33] The public and the taxpayers will also be harmed if shortfalls in Medicaid funding require tax increases or cuts in other programs or services to make up for the shortfall in Medicaid funding. Thus, there is a sufficient demonstration of irreparable injury to support maintaining the stay of the Superior Court's mandate.

B.      Likelihood of Success on the Merits

[¶34] Turning to the question of probable or strong likelihood of success on the merits: No matter how much the Commissioner may want to prepare and submit a Medicaid expansion plan to the federal government, federal law bars him from doing so without an identified source of funds to support the expanded program throughout the fiscal year, not just for the first nine or ten months of the fiscal year.

[¶35] The lengthy and detailed federal law that governs filing a state Medicaid plan is 42 U.S.C.S. § 1396a (LEXIS through Pub. L. No. 115-230). Section 1396a(a)(2) directs, "A State plan for medical assistance must . . . provide for financial participation by the State equal to not less than 40 per centum of the non-Federal share of the expenditures under the plan with respect to which payments under [42 U.S.C.S. § 1396b] are authorized by this title . . . and . . . provide for financial participation by the State equal to all of such non-Federal share or provide for distribution of funds from Federal or State sources, for carrying out the State plan, on an equalization or other basis *which will assure that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope, or quality of care and services available under the plan*." (Emphasis added.)

[¶36] Later provisions in section 1396a establish that the relevant non-Federal share of required state participation in the Medicaid expansion program will be ten percent of program costs. There being no funds appropriated for Medicaid expansion, the Commissioner has no capacity to submit a plan identifying the required state financial participation, estimated to be more than $40,000,000 for fiscal year 2019, according to the record before this Court.

[¶37] The plaintiffs argue that there are sufficient resources to meet the plan's financial requirements by utilizing the existing Medicaid appropriation to support the expanded eligibility, and that this resource is sufficient to carry the program into next spring. That argument ignores that second part of section 1396a(a)(2), which requires that the financial plan not only serve the present but "assure that the lack of adequate funds from local sources will not result in lowering the amount, duration, scope, or quality of care and services available under the plan." 42 U.S.C.S. § 1396a. If the plaintiffs' funding plan were adopted or included in a plan ordered submitted by the court, the approved Medicaid plan to serve current Medicaid beneficiaries could be placed at risk because, by design, the plaintiffs' financial plan, by next spring, will "result in lowering the amount, duration, scope, or quality of care and services available under the plan." *Id.*

[¶38] The plaintiffs also argue that if no appropriation of $40,000,000 is forthcoming, the state courts, or perhaps the federal courts, could order that state funds be gathered from other sources and spent to serve the needs of those made eligible for services by the Medicaid expansion law. In effect, the plaintiffs invite the courts to become a last resort appropriations process, directing funding for programs and services authorized by law but not funded,

or not sufficiently funded, through the legislative and gubernatorial appropriations approval process.

[¶39] Court involvement in ordering funding for statutorily authorized programs, when appropriations to support such programs fail or are viewed as inadequate to meet perceived needs, would violate Maine's strict separation of powers requirements as stated in article III of the Maine Constitution (Distribution of Powers). Article III states:

> **Section 1. Powers distributed.** The powers of this government shall be divided into 3 distinct departments, the legislative, executive and judicial.

> **Section 2. To be kept separate.** No person or persons, belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others, except in the cases herein expressly directed or permitted.

[¶40] In *Sawyer v. Gilmore*, 109 Me. 169, 178, 83 A. 673 (1912), when called upon to review a legislatively approved school funding formula asserted to be an unconstitutional violation of equal protection, we declined, observing, "We are not to substitute our judgment for that of a coordinate branch of the government working within its constitutional limits." *Id.* Later in the opinion, and relevant to the case at hand, we reminded litigants that

> it is not always borne in mind that the Constitution operates differently with respect to these different branches. The authority of the executive and judicial departments is a grant. These

> departments can exercise only the powers enumerated in and conferred upon them by the Constitution and such as are necessarily implied therefrom. The powers of the Legislature in matters of legislation, broadly speaking are absolute, except as restricted and limited by the Constitution. As to the executive, and judiciary, the Constitution measures the extent of their authority, as to the Legislature it measures the limitations upon its authority.

*Id*. at 180.

[¶41] The limitations on the power of the courts to order State spending for statutorily authorized programs, for which appropriations have not been approved, or for which approved appropriations are deemed inadequate, are emphasized by Me. Const., art. V, pt. 3, § 4:

> **Section 4. No money drawn except upon appropriation or allocation.** No money shall be drawn from the treasury, except in consequence of appropriations or allocations authorized by law.

[¶42] In *Weston v. Dane*, 51 Me. 461 (1862), and *Weston v. Dane*, 53 Me. 372 (1865), the Court considered a legislative resolve that had authorized George Weston to be paid a commission of twenty percent for his successful efforts to obtain federal reimbursement for state expenditures for a regiment organized and sent by the State in the Mexican War. The commission was to be paid from the recovered funds, which totaled $ 10,308.28. *Weston*, 51 Me. at 463. Weston brought an action for a writ of mandamus to recover $1,000 that remained unpaid. *Id.*

[¶43]   Addressing an older version of Me. Const., art. V, pt. 3, § 4,[6] the Court held that it could not order reimbursement of authorized funds without appropriation and, under the older version of section 4, a governor's warrant. "The petition, stripped of the specious disguise thrown around it by the able argument of counsel in its support, asks us to command the treasurer to pay money in violation of the clear and distinct provisions of the constitution, by virtue of which he and we exercise the several trusts reposed alike in him and in us.  The writ is denied." *Weston*, 51 Me. at 465.  The 1865 opinion addressed the same claim, but without specific reference to Me. Const., art. V, pt. 3, § 4. *Weston*, 53 Me. At 372-373.

[¶44]   Relevant, more modern opinions include *KHK Associates v. Department of Human Services*, 632 A.2d 138 at 140-141 (Me. 1993), which, as part of its reasoning, applied Me. Const., art. V, pt. 3, § 4, in allowing the State to abandon a lease for a building that had been built for the State in Aroostook County because of financial cutbacks and lack of an appropriation.  See also *SC Testing Technology, Inc. v. Department of Environmental Protection*,

---

[6] The older version of Me. Const., art. V, pt. 3, § 4 stated "that no money shall be drawn from the treasury, *but by warrant from the Governor and Council,* and in consequence of *appropriations* made by law; and a regular statement and account of the receipts and expenditures of all public money shall be published at the commencement of the annual session of the Legislature." *Weston v. Dane*, 51 Me. 461, 463-64 (1862).  In the citation, the *Weston* opinion references "part 4," but this is a citation error.

688 A.2d 421 at 424-425 (Me. 1996), another case where the Court approved the State abandoning a contract after the contractor had made significant commitments pursuant to a legislative authorization that was not funded by an appropriation.

[¶45] While not reaching the merits, the Court suggests that the citizen initiative portion of Me. Const., art. IV, pt. 3, § 19, may authorize the courts to mandate funding for citizen-initiated legislation that requires funding if the Legislature fails to appropriate funds to implement the initiative. Court's Opinion ¶ 10. Section 19 provides, in pertinent part, "that any such measure which entails expenditure in an amount in excess of available and unappropriated state funds shall remain inoperative until 45 days after the next convening of the Legislature in regular session, unless the measure provides for raising new revenues adequate for its operation." [7]

---

[7] The "45 days after the next convening of the Legislature in regular session" language was added to section 19 in 1951 by Me. Const. amend. LXVI. *Opinion of the Justices*, 460 A.2d 1341, 1350 (Me. 1982). At the time "there was then only one 'regular session' of the Legislature, which convened biennially on the first Wednesday of January." *Id.* "[T]he amendment avoided the possibility that the 45-day period would be activated by a special session of the Legislature. Thus, the amendment provided ample opportunity for the Legislature to enact funding measures or take any other constitutionally authorized steps by insuring that the 45-day period would commence only at the next regular session after the regular session to which the measure had been presented." *Id.*

The Legislature was operating with a First Regular Session and a Second Regular Session at the time of the 1982 *Opinion of the Justices*. *See id.*; *see also* Me. Const., art. IV, pt. 3, § 1. The *Opinion of the Justices* did not address whether the schedule that applied at the time of the 1951 amendment would govern the running of the 45 days, or whether that changed with the later amendment of Me. Const., art. IV, pt. 3, § 1, to establish two "regular" sessions. If the original schedule applied, for

[¶46]  Section 19 does not specify any remedy if no appropriation is adopted.  Considering that, as specified in *Sawyer*, 109 Me. at 180, the court's authority to act must be found in our Constitution, section 19 provides no invitation or authority for the courts to mandate funding to implement an unfunded citizen initiative.

[¶47]  In addition, section 19 does not exempt citizen-initiated legislation from the requirement of Me. Const., art. V, pt. 3, § 4, that no state funds "be drawn from the treasury, except in consequence of appropriations or allocations authorized by law."  The two Constitutional provisions must be read consistently, so that each remains in effect.  *See Penobscot Nation v. Stilphen*, 461 A.2d 478, 481 (Me. 1983) ("We will not read a statute to conflict with another statute where an alternative, reasonable interpretation yields harmony.").

[¶48]  Neither the Maine Constitution, nor these precedents, suggests that the courts cannot order the State to pay benefits to individuals who are found to qualify for certain benefit payments when there is an appropriation to support payment of benefits.  In *Manirakiza v. Department of Health & Human*

---

this case, the 45 days would not begin to run until the convening of the new Legislature following the 2018 elections.

*Services*, 2018 ME 10, ¶¶ 7-15, 177 A.3d 1264, the Legislature had appropriated funds to support payment of benefits to certain food stamp applicants, but had imposed a fiscal cap on those benefit payments in the initial years of the program. Manirakiza would have been excluded from eligibility for benefits had he applied for benefits in the years in which the appropriations cap applied. *Id.* ¶¶ 3, 15. Manirakiza applied for benefits at a time when we held that the appropriations cap had expired. *Id.* ¶ 15. Accordingly, we held that Manirakiza was entitled to be paid benefits because he qualified for benefits and appropriations had been made to pay for the benefits. *Id.* ¶¶ 1, 15.

[¶49] The appeal was decided based on statutory interpretation of the cap, not constitutional issues. *Id*. ¶¶ 4, 7-15. Inferentially, the opinion suggests, as a matter of statutory interpretation, that although Manirakiza was eligible for benefits under the particular food stamp program to which he applied, the Court could not and would not have ordered benefits to be paid to him if the cap had applied or if, as is before us today, there was no appropriation at all for the particular program.

## III. CONCLUSION

[¶50] Because the Commissioner has established that our refusal to continue the stay will cause irreparable harm to the existing Medicaid program,

its beneficiaries, and the public, and because the Commissioner has established a strong likelihood of success on the merits of his appeal, the stay should continue in effect pending our resolution of the appeal of the trial court's mandate to prepare and file a Medicaid expansion plan, despite the lack of an appropriation to fund the expansion.

[¶51] Prior to the November 2017 initiative vote to approve the Medicaid expansion, the Secretary of State's Maine Citizens Guide to the Referendum Election for that November 7, 2017, election, addressing the Medicaid Expansion Initiative, stated that if the Medicaid expansion was "approved by the voters, additional implementing legislation will be required to provide the additional appropriations and allocations." That observation, explaining the implications of the initiative, was a correct statement of the prerequisites to implement the citizen initiative then, and it remains a correct statement today.

[¶52] Before implementation of the program can begin, and before an implementation plan can be submitted to the federal government, there must be an appropriation to support the program properly enacted into law by the Legislature. Without an appropriation for the Medicaid expansion program, the separation of powers mandated by article III of the Maine Constitution bars the

courts from ordering appropriation and expenditure of state funds for that new program.

_____

Patrick Strawbridge, Esq. (orally), Consovoy McCarthy Park PLLC, Boston, Massachusetts, for appellant Commissioner, Department of Health and Human Services

James T. Kilbreth, Esq. (orally), and David M. Kallin, Esq., Drummond Woodsum & MacMahon, Portland; Jack Comart, Esq., and Robyn Merrill, Esq., Maine Equal Justice Partners, Augusta; and Charles F. Dingman, Esq., PretiFlaherty, Augusta, for appellees Maine Equal Justice Partners et al.

Business and Consumer Docket docket number AP-2018-02
FOR CLERK REFERENCE ONLY